BANK OF HOXIE *v.* MERIWETHER.

Opinion delivered October 20, 1924.

1. PARTY WALLS—EQUITABLE LIEN.—Under an agreement of an adjacent proprietor to pay part of the cost of a party wall when he commenced to use it, a charge is created in the nature of an equitable lien upon the lot upon which the wall is erected.

2. COVENANTS—REAL AND PERSONAL COVENANTS DISTINGUISHED.— Real covenants relate to realty, having for their main object some benefit to the realty and inuring to the benefit of and becoming binding upon subsequent grantee, while personal covenants do not run with the land.

3. PARTY WALLS—EASEMENT ON ADJACENT LOTS.—Benefits and burdens attaching to party walls, erected on the boundary line between two lots as part of the freehold, under an agreement expressly made binding on heirs and assigns of owners of both lots, *held* to follow ownership of the respective lots.

4. PARTY WALLS—NOTICE TO MORTGAGEE.—Where a party wall agreement was not acknowledged or recorded, a subsequent mortgagee will not be held to have constructive notice of its execution or contents.

5. PARTY WALLS—NOTICE TO MORTGAGEE.—The fact that a mortgagee knew that the owner of an adjoining lot had built a party wall, which the mortgagor subsequently used as a wall of his building, did not constitute actual notice of the adjoining owner's claim for half of the cost of erecting the wall, under agreement with the mortgagor's grantor, in the absence of a showing that the mortgagee knew that the mortgagor did not contribute his share of the cost.

6. PARTY WALLS—PAYMENT OF COST—PRESUMPTION.—In the absence of notice to the contrary, a mortgagee had a right to presume that his mortgagor had paid his share of the cost of a party wall, immediately on his completion of the building of which the wall became a part, as provided by a contract between the adjacent owner and the mortgagor's grantor.

7. PARTY WALL—NOTICE TO MORTGAGEE.—The fact that half of a party wall was on a mortgagor's land would put any one on notice of matters affecting his title that inquiry might disclose, and hence would preclude removal of the wall by the mortgagee as a trespass on the land, but is no notice of an obligation to contribute to its cost on making use of it; notice only of those facts that are naturally and reasonably connected with the known facts being imputed.

8. BANKS AND BANKING—NOTICE TO CASHIER.—Notice to the cashier of a bank holding a mortgage on a lot that the owner of an adjoining lot claimed an equitable lien on the mortgaged lot for payment of. half of the cost of a party wall is notice to the bank.

9. PRINCIPAL AND AGENT—NOTICE TO AGENT.—A principal is affected with notice of all that his agent knows, in the line of his duty or within the scope of his powers.

10. CORPORATIONS—AGENT'S KNOWLEDGE.—As corporations must act through agents, the general rule is that knowledge of an agent acquired in the ordinary discharge of his duties for the corporation is imputed to the corporation.

11. BANKS AND BANKING—CIRCUMSTANTIAL EVIDENCE TO PROVE NOTICE.—That the cashier of a bank holding a mortgage on a lot, when it was executed knew the terms of a party wall agreement, and that neither the lot owner nor his grantor had paid for half of the party wall as agreed, may be shown by circumstantial evidence.

12. PARTY WALLS—LIEN—MERGER OF ESTATES.—That a mortgagee of a lot acquired the mortgagor's interest therein did not extinguish, under the doctrine of merger of estates, the adjoining owner's equitable lien on the lot for. half of the cost of a party wall erected under agreement with the mortgagor's grantor, neither mortgagor nor mortgagee being party to the party wall agreement or personally liable thereon, and the adjoining owner having nothing to do with the conveyance by the mortgagor to the mortgagee.

Appeal from Lawrence Chancery Court, Eastern District; *Lyman F. Reeder,* Chancellor; affirmed.

STATEMENT OF FACTS.

On the 22d day of March, 1922, T. J. Sharum brought this suit in equity against Gus Mitchell and the Bank of Hoxie to foreclose two mortgages given to him by Gus Mitchell on a certain lot in the town of Hoxie, Lawrence County, Arkansas.

The Bank of Hoxie was made a party on the ground that it claimed to have a mortgage against the same property. The Bank of Hoxie joined in the suit, and asked for a foreclosure of its mortgage against the property.

Subsequently C. J. Saenger filed an intervention and asked for the foreclosure of an equitable lien claimed by him against said property, on the ground that he had erected a party wall, and that the amount agreed to be given him for erecting said wall had not been paid.

It appears from the record that the intervener, C. J. Saenger, being the owner of a certain lot in the business section of Hoxie, entered into a written agreement with E. P. Richardson, the owner of the adjoining lot, for the erection of a party wall. The agreement was signed in duplicate on the 14th day of May, 1913, by the parties to it, and A. G. Allbright and A. G. Richardson signed the agreement as witnesses. The agreement recited that C. J. Saenger proposed to erect a two-story store building on his lot, with a side wall thirteen inches thick. It was agreed that one-half of the side wall should be erected on the lot of E. P. Richardson by C. J. Saenger, and that this wall should be known as a party wall, and should be owned in common by the owners of the respective lots on which it was situated.

It was further agreed that, inasmuch as Saenger was to pay the entire cost of the erection of the party wall, because his building was first to be constructed, and because Richardson was undecided whether he would erect a one or a two-story building on his lot, he should pay to Saenger one-half of the value of whatever part of the party wall he used, immediately upon the completion of the building on his lot.

It was further provided that the entire agreement should be made binding on the heirs or assigns of both parties. The agreement was neither acknowledged nor recorded.

After the party wall had been erected by Saenger, Richardson conveyed his lot to Gus Mitchell. In the summer of 1920 Gus Mitchell commenced and completed the erection of a two-story brick store building on his lot, and used the party wall as one side of the building. On August 20, 1920, Mitchell borrowed $6,000 from T. J. Sharum, and executed a mortgage on his lot to secure the

payment thereof. On December 24, 1920, he borrowed $3,000 from the Bank of Hoxie, and executed a mortgage on said lot to secure the payment thereof. On February 21, 1921, he borrowed an additional sum of $2,623.37 from T. J. Sharum, and executed a mortgage on said lot to secure the payment of the same. All of these mortgages were duly filed for record when they were executed.

According to the testimony of C. J. Saenger, Gus Mitchell purchased his lot from E. P. Richardson in May, 1920. Mitchell began the erection of a two-story building upon the lot immediately after his purchase, and completed it in the summer of 1920. While the building was being constructed, Saenger entered into negotiations with Mitchell for the payment of his half of the party wall. Negotiations were pending for some time, and in October, 1920, a compromise was reached whereby Mitchell promised to settle with Saenger for the party wall in the sum of $1,068, which was estimated by these parties to be one-half of the value of the party wall.

A. G. Allbright, one of the subscribing witnesses to the agreement to build the party wall, was cashier of the Bank of Hoxie; but the record does not show whether he was cashier of the bank at the time he witnessed the agreement in 1913, or not.

It appears from the record that he was cashier of the bank in the summer of 1920, when Mitchell erected the two-story building on his lot. During the period of time while Mitchell was erecting the building on his lot, Saenger spoke to Allbright, at various times, about the amount which Mitchell should pay him for his half of the party wall, and Allbright at this time was cashier of the Bank of Hoxie. He was also cashier of said bank in December, 1920, when the bank lent Mitchell the $3,000 and took a mortgage on said lots to secure the payment of the same.

Mitchell made default in the payment of all of said mortgages, and also failed to pay Saenger for his half of the party wall. Subsequently Mitchell was adjudged a bankrupt.

T. J. Sharum had· no notice of the party wall agreement between Saenger and Richardson at the time the mortgages were executed to him by Mitchell, the grantee of Richardson. In April, 1922, T. J. Sharum became the owner by purchase of the lot of Gus Mitchell on which one-half· of the party wall in question is situated. At that time he had been fully advised as to the claim of Saenger with regard to the party wall.

The chancellor found the facts to be substantially as above stated, and declared that the real point in issue on the law of the case is the question of priority of liens between Saenger and the Bank of Hoxie. The chancellor was of the opinion that the Bank of Hoxie took its mortgage from Mitchell with notice of the equitable lien of Saenger upon the lot for one-half of the cost of the party wall, under the agreement providing for its erection. A decree in accordance with the finding of the chancellor was rendered. The foreclosure of the respective mortgages of T. J. Sharum and of the Bank of Hoxie, according to their priorities, was provided for in the decree.

It was further decreed that the written agreement between C. J. Saenger and E. P. Richardson constituted a covenant running with the land, and that Saenger had a lien upon the lot owned by Gus Mitchell as grantee of E. P. Richardson and the Bank of Hoxie, a purchaser from him with notice of the lien.

To reverse that decree the Bank of Hoxie has duly prosecuted an appeal to this court. T. J. Sharum has since died, and the cause has been revived in the name of his administrator and heirs.

*Ponder & Gibson,* for appellant.

The agreement between Saenger and Richardson created only a personal obligation of Richardson for the payment of such part of the wall as he might use. (A). Because such is the legal construction of the contract. 78 Ark. 65; 54 N. Y. 444; 28 Ind. 37; 29 Miscel. 81; 37 N. Y. 106; 161 Mass. 489; 31 N. Y. Supp. 851; 11 Miscel. Rep. 9; 81 Tex. 201; 46 Ga. 19; 57 Ind. 88; 10 Pa.

St. 155; 102 Iowa 206; 159 N. W. 441; 17 Pick. 538; 117 Mass. 387; 124 N. Y. 224; 115 Ill. 199. (B). Because the contract shows on its face that such was the intention of the parties. 102 Ind. 166; 120 Mich. 545; 81 Mo. 545; 26 Ill. App. 417. The party wall agreement between Saenger and Richardson did not create an incumbrance upon the land of Richardson. (A). Because such an agreement does not create an incumbrance which will constitute a breach of covenant against incumbrances. 37 N. Y. 106; 3 Daily 64; 43 N. Y. Sup. Ct. 328; 54 How. Pr. 340; 50 N. Y. 644; 31 Iowa 46; 7 Penn. Dist. R. 375. (B). That such an agreement does not give priority over other liens. 93 Ill. 359. No lien existed by reason of the party wall agreement. (A). Because the instrument creating such agreement was not recorded. See §§ 1516 and 8624, C. & M. Digest. (B). Because the agreement, not being recorded, the same did not constitute notice as against subsequent mortgagees or purchasers, even if they had actual notice thereof. 9 Ark. 112; 20 Ark. 190; 18 Ark. 105; 49 Ark. 457; 68 Ark. 168; 71 Ark. 517. Even if the party wall agreement created a covenant running with the land, or any other lien or easement on the land which could be enforced in equity, when the wall was used by Mitchell the covenant ceased to be a running one and became a personal covenant of Mitchell, and all parties dealing with the land thereafter were authorized to infer that payment or settlement had been made. 98 U. S. 56; 12 Ala. 159; 135 Mass. 151; 155 Mass. 79; 38 Bard. 191; 21 Wend. 123; Rawle, Covenants, 5 ed. § 204; 56 Miss. 700; 35 Sou. 218; 161 Mass. 487; 28 Pa. Sup. Ct. 587. If the agreement created a covenant which ran with the land, notice was not a requisite to its enforcement, and the lien of Saenger, being a first lien, and Sharum, holding the last mortgage and being the last purchaser, must discharge the Saenger lien, as well as the lien of the appellant. 20 Ohio St. 414; 44 La. Ann. 492; 24 La. Ann. 113; 27 La. Ann. 119; 1 La. Ann. 140; Simms on Covenants, 138 and 171; 1 Bradf. 40; 3 Cush. 500; 155 Mass. 444; 124 Mich. 545; 67 Minn.

25. If a lien of any kind in favor of Saenger was created by the agreement and notice was necessary to its enforcement, the fact that the wall was standing half on Mitchell's lot was notice to all parties dealing with the property, and placed them on inquiry. 86 Ill. App. 380. And the wall standing as it did was sufficient notice to put all upon inquiry as to his rights thereto. 129 Iowa 569; 105 N. W. 61; 10 Phila. 341; 33 Ark. 465; 34 Ark. 391; 35 Ark. 195; 47 Ark. 533; 41 Ark. 169; 145 Ark. 306. There was no special notice to the Bank of Hoxie such as would charge it solely, as knowledge acquired by a bank officer in his private capacity and not while acting for the bank, and which was not communicated to any other officers of the bank, is not imputed to it. 3 R. C. L. 477 and 478; 65 Ark. 543. If shown, it also had notice that a settlement by notes had been made, and relied thereon. Saenger, knowing of the existence of the mortgages to Sharum and the bank, is guilty of laches and estopped from maintaining the suit. By Sharum's purchase a merger resulted, and the Sharum liens were extinguished, and the lien of Saenger, if any, and of the bank became the sole existing liens on the property.

*W. P. Smith* and *Lester L. Gibson,* for appellee.

The court's finding of fact, upon conflicting evidence, will not be disturbed. 161 Ark. 1; 160 Ark. 508. Knowledge of an agent as to a material fact bearing upon the validity of a contract made on behalf of his principal is imputed to the latter. 21 R. C. L., Principal & Agent, p. 839-40, art. 21. Such knowledge, though acquired in a private capacity, if still within his memory, is imputed to his principal. Same citation, art. 22. The bank was therefore put on notice to investigate, and, failing to do so, its claim should be held in abeyance pending the intervener's claim. 94 Ark. 503. The agreement between Saenger and Richardson created more than a personal obligation of Richardson for the payment for such part of the wall as he might use, and was a covenant running with the land and binding on his heirs and assigns. 7 R. C.

L. Covenants, art. 23, pgs. 1107-8; 78 Ark. 65; 2 L. R. A. (N. S.) 87. See 28 Iowa 229; 102 N. W. 621. The title to the wall remained in the original builder or his assignee, since the terms of the agreement had not been carried out, and a lien existed for the payment of same. 15 C. J., art. 52, p. 1240, Covenants, note (a); same citation, p. 1251, note (a); 155 Mass. 444.. In any event the covenant created a lien on the land which equity will enforce. 120 Mich. 545. A lien existed by reason of the party wall agreement, whether the instrument was recorded or not. 30 Cyc. p. 791; 27 La. Ann. 199. Where a lien is found to exist, it follows the land in the hands of a subsequent purchaser who takes with notice of its existence. 61 Minn. 65; 44 W. Va. 335. An interesting discussion of party wall contracts may be found in 89 Am. St. Rep. p. 941.

HART, J.; (after stating the facts). The first question to be decided is, does the party wall agreement between C. J. Saenger and E. P. Richardson, executed on the 14th day of May, 1913, constitute a covenant running with the land? The agreement was in writing, and provides for the erection of a party wall thirteen inches wide, one-half of which was to be on the lots of the respective parties, and was to be owned in common. Inasmuch as Saenger was to erect his store building first, it was provided that the party wall should be erected by him and constitute a part of his store building. When Richardson desired to erect a building on his lot, the party wall became a part of such structure, and he was immediately to pay for one-half of the cost of it. The agreement further provided that it was binding upon the heirs or assigns of both parties. While the authorities are in conflict with respect to the legal effect of agreements providing for the construction of party walls between adjacent landowners, the question is no longer an open one in this State.

In the case of *Rugg* v. *Lemley,* 78 Ark. 65, it was held that, under an agreement of an adjacent proprietor to pay part of the cost of a party wall when he commenced

to use it, a charge is created in the nature of an equitable lien upon the lot upon which the wall is erected, which is enforceable in equity.

The court recognized that there was a conflict in the authorities, and, after due consideration, adopted the rule that, where the covenant is similar to the one in this case and contains a clear manifestation of an intent that it should run with the land and bind the parties and their assigns, such party wall agreement creates an equitable charge, easement, and servitude upon the lots upon which it is built. In short, it was held that agreements of this sort, when duly acted upon, create cross-easements in the respective owners of the adjacent lots with which the covenants in the agreements will run so as to bind the parties and their assigns. The distinction between real and personal covenants is that the former relate to the realty, having for their main object some benefit to the realty and inuring to the benefit of and becoming binding upon subsequent grantees, while the latter do not run with the land.

In the case before us, the contract between Saenger and Richardson was not merely personal to them. The wall erected on the boundary line between the two lots was intended to be, and was, a part of the freehold. It was erected for the use and benefit of future, as well as the present, owners of the lots. The agreement under which the party wall was built did not restrict the right to use the wall to E. P. Richardson and C. J. Saenger. On the other hand, it expressly provides that the entire agreement was made binding on the heirs and assigns of both parties. The wall was intended for the use and convenience of both lots. Each of the adjacent owners had an equal interest in the wall. It was as firmly attached to, and became as much a part of, each lot as any other part of the buildings erected on them could be, and the benefits and burdens attaching to the wall followed the ownership of the respective lots.

We have not set out the written agreement providing for the construction of the party wall in full, but we

have set out the material portions thereof. It is clear, from the portions which we have specially referred to, that the agreement for the party wall contains a covenant running with the land; for a covenant runs with the land when either the liability to assume its burdens or the right to use its benefits passes to the assignees of the landowners.

The chancellor was right in holding that T. J. Sharum had no notice, actual or constructive, of the agreement providing for the erection of the party wall, at the time he took the two mortgages from Mitchell which are sought to be foreclosed in this suit. The agreement for the party wall was in writing, but was not acknowledged or recorded. Therefore Sharum had no constructive notice of its execution or contents. Crawford & Moses' Digest, § 1536.

It is admitted that Sharum had no actual knowledge of the claim of Saenger arising out of the agreement between him and Richardson for the erection of the party wall. The fact that he might have known that Saenger had built the wall and that afterwards Mitchell, the grantee of Richardson, had used it as one of the walls of his building on his lot, would not constitute notice. The reason is that it is not shown that Sharum knew that Mitchell did not contribute his share of the cost of the building of the party wall, when he erected his store building in the summer of 1920, and made the party wall one of the walls of his building.

In the absence of notice to the contrary, Sharum had a right to presume that Mitchell had paid his share in the cost of the wall, since the agreement provided expressly that he should make the payment immediately upon the completion of his building of which the party wall became a part. *Kells* v. *Helm & Yerger*, 56 Miss. 700.

It is true, as contended by counsel for appellant, that one-half of the party wall was upon the land of Mitchell, and this would put any one upon notice of any matters affecting his title that an inquiry would disclose. This court has repeatedly held that actual possession of

land at the time of another's purchase is sufficient to put the purchaser upon inquiry of the possessor's title. In the application of this rule Sharum, as a purchaser from Mitchell, would have no right to require the removal of the wall as a trespass upon his realty.

In *Hawkes* v. *Hoffman,* 24 L. R. A. (N. S.) 1038, the Supreme Court of Washington held that the mere existence, at the time one purchases a lot, of a party wall resting partly thereon and in use by the owner of the adjoining lot, is not notice of an obligation to contribute to its cost upon making use of it. The reason is that the rule imputes notice only of those facts that are naturally and reasonably connected with the facts known, and of which the known facts can be said to furnish a clue.

As we have already seen, the agreement of Richardson and his assigns to pay part of the cost of the party wall, when he commenced to use the wall, became a charge in the nature of an equitable lien upon the lot upon which the wall was erected, and was enforceable in equity. The party wall having become a part of the realty, the charge against it was in equity a lien for the purchase money, not only while the property was owned by Richardson, the vendee, but also by all subsequent purchasers having notice that the purchase money remains unpaid.

The principles from which courts of equity have proceeded in establishing this lien, in the nature of a trust, is, that a person who has got the estate of another ought not, in conscience, as between them, to be allowed to keep it and not pay the full consideration money. And third persons, having full knowledge that the estate has been so obtained, ought not to be permitted to keep it without making such payment, for it attaches to them also, as a matter of conscience and duty. *Shall* v. *Biscoe,* 18 Ark. 142; *Day* v. *Gaines,* 130 Ark. 167.

Mitchell built his store upon his lot in the summer of 1920, and used the party wall as one of the walls of it. As soon as he used the party wall, under the agreement

of his grantor with Saenger, he became immediately bound to pay his part of the cost of it.

Saenger testified that, for some time, he was unable to agree with Mitchell about the cost of the party wall or that he was liable to pay any part of the same. During the course of the negotiations he frequently talked with Allbright, who was the cashier of the Bank of Hoxie, about the matter, and Allbright well knew that he claimed an equitable lien upon the lot for the payment of one-half of the cost of the party wall. Allbright was the cashier of the Bank of Hoxie at this time, and also in December of the same year, when the mortgage of Mitchell to the bank in question was executed.

Notice to Allbright, who was the cashier of the bank, was notice to the bank.

The general rule is that the principal is affected with notice of all that his agent knows in the line of his duty or within the scope of his powers. *Peebles* v. *Columbian Woodmen,* 111 Ark. 435.

A corporation must necessarily act through agents, and the general rule is that knowledge of an agent acquired in the ordinary discharge of his duties for the corporation is ordinarily to be imputed to the principal. *Little Red River Levee Dist. No. 2* v. *Garrett,* 154 Ark. 76, and *First Natl. Bank.* v. *Duvall,* 156 Ark. 377. Applying the principle decided by these cases to the facts of this case, it is manifest, we think, that Allbright, as cashier of the Bank of Hoxie, and in the discharge of his duties as such cashier, acquired knowledge of the terms of the party wall agreement and of the fact that neither Mitchell nor his grantor had paid for half of the party wall, as provided in the agreement. The knowledge acquired by the cashier was present in his mind at the time he took the mortgage on the lot in question from Mitchell to the Bank of Hoxie. That such knowledge was in the cashier's mind when the mortgage was executed may be shown by circumstances as well as by direct evidence.

As we have already seen, negotiations looking to a settlement of the equitable lien claimed by Saenger on the lot of Mitchell were pending during the period of the construction of the building by Mitchell in the summer of 1920, and for some time thereafter. During this time Saenger talked with the cashier of the bank about his lien and fully explained the nature of it to him. Finally, in October, 1920, Saenger reached an agreement with Mitchell whereby the value of the wall was placed at $1,068, and Mitchell executed to Saenger a number of promissory notes as evidence of the amount due. He paid two of these notes, amounting in the aggregate to $168. The balance of the amount due was unpaid. The notes given by Mitchell to Saenger were payable at the Bank of Hoxie, and were dated October 20, 1920. The mortgage of Saenger to the bank was executed on the 24th day of December, 1920. These facts and circumstances clearly show that the knowledge of the equitable lien of Saenger existed in the mind of the cashier of the bank when the mortgage from Mitchell to the bank was executed.

It appears from the record that T. J. Sharum acquired the title of Mitchell in the lot in question in April, 1922, and counsel for appellant insist that this created a merger of the estates which extinguished the lien of Saenger. We do not think so. It results from the principles announced above that Saenger had no claim of personal liability against either Mitchell or Sharum. The reason is that neither of them was a party to the contract for the party wall, and became in no wise personally liable by the contract. The contract created a covenant running with the land, and Saenger had the right to enforce his equitable lien against the lot in the manner shown above; but he could not obtain a personal judgment against any of the parties to this suit for the amount thereof. Saenger had nothing whatever to do with conveying the land to Sharum, and we cannot see where the doctrine of merger has any application, in so far as he is concerned.

It follows that the decree will be affirmed.